IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

GERIANNE MORRISON,
        Plaintiff,

v.

        Case No. 2:01-CV-1143
        JUDGE EDMUND A. SARGUS, JR.
        Magistrate Judge Norah McCann King

GERALD STEIMAN, et al.,
        Defendants.

## OPINION AND ORDER

This matter is before the Court for consideration of the Motions of Plaintiff and Defendant Nationwide Insurance Company for Judgment as a Matter of Law on the Administrative Record. For the reasons that follow, Plaintiff's motion (Doc. #43) is granted and Defendant Nationwide's motion (Doc. #44) is denied.

### I.

Plaintiff, Gerianne Morrison ["Plaintiff"], brings this action challenging the decision of her former employer, Defendant Nationwide Insurance Company ["Nationwide"], to deny her long-term disability benefits. Plaintiff's claim is pursuant to the Employee Retirement Income Security Act of 1974 ["ERISA"], 29 U.S.C. § 1132. When this suit was originally commenced, Plaintiff asserted additional claims, which were ultimately dismissed by this Court[1]. In February

---

[1] On September 6, 2002, this Court dismissed Plaintiff's claim against under the civil provision of the Racketeer Influenced and Corrupt Organizations Act ["RICO"], 18 U.S.C. § 1962, as well as state law claims for negligence, fraud and alleged wrongful portrayal of Plaintiff in a false light. The Court dismissed as Defendants Dr. Gerald Steiman and the Columbus Neurological Group.

2001, Plaintiff was approved for Social Security benefits. In March 2003, the Court remanded this case to Defendant Nationwide to re-consider its denial of long-term disability benefits in view of Plaintiff's receipt of Social Security benefits. Nationwide did not alter its decision. This case was re-opened on November 15, 2004. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Plaintiff, who is a Registered Nurse, began work with Nationwide in 1987 as a claims adjuster. Plaintiff suffers from various disorders, most notably syringomyelia[2]. She was out of work from May 1996 to February 1997. Plaintiff returned to work as a Business Technology Consultant, in which capacity she acted as a coordinator of training programs and consultant for claims adjusters. (Admin. Record at 214)[3]. This job required Plaintiff to sit between five to eight hours per day, primarily working at a computer, with standing, walking or bending/stooping for one to three hours per day. Plaintiff performed minimal lifting. (*Id.* at 462). When Plaintiff's symptoms worsened, she ceased work in July 1998. (*Id.* at 212). On July 27, 1998, Plaintiff applied for and received disability benefits. (*Id.* at 55).

---

[2]Syringomyelia is defined as
> a slowly progressive syndrome of cavitation in the central segments of the spinal cord, generally in the cervical region, but sometimes extending up into the medulla oblongata . . . or down into the thoracic region; it may be of developmental origin, arise secondary to tumor, trauma, infarction, or hemorrhage, or be of unknown cause. It results in neurologic deficits, usually segmental muscular weakness and atrophy with a dissociated sensory loss (loss of pain and temperature sensation, with preservation of the sense of touch), and thoracic scoliosis is often present. . . .

DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1841 (30th ed. 2003).

[3]The Court notes that the Administrative Record in this case was not filed in chronological order, which made the Court's review quite cumbersome. Counsel are advised that, in the future, records should be submitted in chronological order, accompanied by an index.

2

In August 1998, Plaintiff's physician, Dr. Daniel P. Melarango, identified her subjective symptoms as "chronic thoracic pain, GI distress, headaches, chronic back pain and stiffness, muscle spasms, fatigue." (*Id.* at 62). Plaintiff was diagnosed with "Degenerative joint disease C4-5, C5-6, T12-H, L4-5 and L5-S1. Syrinx[4] present between T1 and T2." (*Id.*). Plaintiff was described as being totally disabled from performing her job. According to Dr. Melarango, Plaintiff could return to part-time work, not at her former job but at another job, on October 17, 1998. According to Dr. Melarango, modifications would not assist Plaintiff in returning to her former job as Business Technology Consultant. (*Id.* at 63).

In November 1998, Plaintiff underwent a medical evaluation by Dr. Gerald S. Steiman, a neurologist. Dr. Steiman characterized Plaintiff's medical history as "rather complex.[5]" (*Id.* at 461). Plaintiff complained to Dr. Steiman that her condition had "progressed, restricting all aspects of my life . . . ." (*Id.* at 462). Plaintiff claimed to suffer from headaches with blurred vision, neck pain with stiffness, muscle spasms, shoulder pain radiating to both arms, as well as pain in her mid and lower back and abdomen. (*Id.*). Plaintiff reported that she frequently dropped objects and had burning pain in her legs with tingling which often times caused her to trip. In addition, Plaintiff complained of chest pain with palpatations, general fatigue and a decreased activity level. (*Id.* at 463). Plaintiff reported that pain medication only offered moderate relief. (*Id.*). In his impression, Dr. Steiman noted:

---

[4]Syrinx is "an abnormal cavity in the spinal cord in syringomyelia." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1841 (30th ed. 2003).

[5]Plaintiff was thrown from a horse in 1989 and in 1994 she began to experience pain in her neck radiating to both forearms, as well as pain in her lower back. In November 1995, Plaintiff experienced low back and leg pain while lifting objects at work. (Admin. Record at 461). At the time of her IME, Plaintiff was forty-three years old, stood 5'6" tall and weighed 145 pounds. (*Id.* at 463).

> Ms. Morrison has discomfort and pain within her head, neck, shoulders, arms, mid back, low back and both lower extremities. She complains of pain within her chest and abdomen. She has symptomatology consisting of a sensory level. Although Ms. Morrison has complaints of pain in all four body quadrants and parts, she does not have objective physical findings to substantiate her discomfort. I do not believe syringomyelia in the lower cervical spine would cause Ms. Morrison to have the discomfort and pain within her neck and upper extremities. The MRI reports do show evidence of degenerative joint and disc disease in the cervical, thoracic and lumbar spine. It is probable that a component of her pain complaints relates to her osteoarthritic and degenerative change.

(*Id.* at 464).

In Dr. Steiman's opinion, Plaintiff was not permanently and totally disabled from any and all occupations, including her former occupation. According to Dr. Steiman, Plaintiff's "current diagnoses appear to be manifested primarily by subjective complaints with a paucity of objective physical findings upon examination. Those findings on the examination would not seem to preclude her ability to perform work activities within her old job description." (Admin. Record at 464-65).

On February 18, 1999, Plaintiff wrote a letter to Nationwide taking issue with Dr. Steiman's report. According to Plaintiff, his report is "misleading and inaccurate" (*Id.* at 270) because his examination lasted only ten minutes and certain testing which he reported as being performed was allegedly not performed. Plaintiff expressed eagerness to be examined by another physician. (*Id.*).

Plaintiff was seen by Dr. Rebecca Brightman, of the Central Ohio Neurological Surgeons, on a continuous basis beginning in 1996, by referral from Dr. Melarango. (*Id.* at 334). Dr. Brightman reviewed Plaintiff's MRI scans of her spine. In December 1998, Dr. Brightman noted that Plaintiff's scan showed a "stable syrinx in the thoracic spinal cord. She has mild cervical

spondylosis at C5-6, and a slightly degenerative disc at that level, but nothing surgical." (*Id.* at 334). In March 1999, following the exam by Dr. Steiman, Dr. Brightman wrote:

> I have encouraged [Plaintiff] to increase her endurance, and we did briefly talk about putting her through some physical therapy. We also talked about her trying to find a flexible job that she could do part time in the years to come. At this point I am not sure it would be wise to make her permanently disabled at her young age and so early in her disease. I'm hopeful that she will be able to cope with some of the disease process and work through it. I have told her that we may want to consider some temporary disability so she can build up her stamina and endurance.

(*Id.* at 333).

On February 24, 1999, Plaintiff was notified that she no longer qualified for long-term disability benefits. Plaintiff's benefits were scheduled to cease on March 8, 1999. (*Id.* at 267-68). Plaintiff appealed this decision and benefits were reinstated for a brief period to allow submission of additional medical evidence. (*Id.* at 228).

On May 6, 1999, Plaintiff was seen by Dr. Ulrich Batzdorf, a neurologist at UCLA Medical Center. In his findings, Dr. Batzdorf noted that Plaintiff's symptoms were of "several different types" with her most severe problem being thoracic pain. (*Id.* at 429). Plaintiff also complained of fatigue and headaches, as well as pain in both arms, shoulders and legs. (*Id.* at 429-30). Dr. Batzdorf reviewed Plaintiff's previous diagnostic studies and noted the following:

> The current scans of the cervical region show straightening of the cervical spine and degenerative disc disease at C4-5 and C5-6 with slight focal reversal of normal lordosis and minimal tendency to kyphosis at this level. There is, however, no evidence of spinal cord compression on either sagittal or axial images and the root sleeves throughout the cervical region are well preserved. There is no evidence of a Chiari malformation. The thoracic scan shows a thin syrinx cavity extending from the T5 level to the mid T11 level at which point the cavity expands rather abruptly and then this dilated segment terminates at about the T12-L1 disc level. The lumbar scan shows that the conus lies approximately at the L1-2 level, and there is diminished signal with very mild bulging of the L4-

5

> 5 and L5-S1 intervertebral discs. The scans, both in the sagittal and axial images, suggests that the nerve roots may be adherent in an abnormal fashion dorsally at about the L2-3 level. In this connection, additional history was obtained that the patient had an attempted epidural anesthetic in connection with delivery of a child in 1977 in Canton Ohio.

(Admin. Record at 432-33).

Dr. Batzdorf could not give a final diagnostic impression until additional studies were performed. Dr. Batzdorf opined that Plaintiff's headaches "may be related to her degenerative cervical disease with slight reversal of the normal cervical lordotic curve." (*Id.* at 433). In addition, Dr. Batzdorf stated:

> [Plaintiff's] syrinx cavity appears more like a very focal dilatation of the central canal in the T11-T12 area with a thin syrinx cavity extending proximally. I would raise the question whether there may be tethering of the cauda equina at the L2-3 level and additional studies may be necessary to establish this. Finally, I wonder whether the patient might have a fibromyalgia-like syndrome to explain some of her other symptoms and she may benefit from a rheumatological evaluation. I note also that the patient has slight compression sensitivity of her left ulnar nerve. Therapeutic recommendations cannot be made at this time but await completion of the diagnostic evaluation.

(*Id.* at 433-34).

In December 1999, Plaintiff was seen by Dr. Michael Miner, a neurosurgeon at the Ohio State University Medical Center. Dr. Miner stated:

> [Plaintiff] is a 44-year-old woman who has been known to have a small thoracic syrinx for several years. She came with multiple MRIs of her cervical, lumbar and thoracic spines. The syrinx is visible on the mri [*sic*] of her lower thoracic spinal cord. It does not extend up to the cervical cord. I could not see any change in it over the past several years. She has been troubled by low back pain and aching heavy feeling to her legs for many years. She tried multiple treatment modalities including aquatic therapy, visualization and relaxation therapy, hypnosis, medication and Vioxx, Flexeril, Ultram, and Darvocet. It is not clear that she has seen any real change in symptoms during the past several years. On occasion she has muscle spasms and "restless" legs. In addition to those

> medications just mentioned, she also takes Sectral, Colace, and Prevacid. She does not have any allergies to medications. She has had multiple surgical procedures including appendectomy in 1989, kidney stones operated on in 1993, as well as a hysterectomy in the same year. She had rhinoplasty after an automobile accident in 1972 and a tonsillectomy in 1979. She does not smoke. She is a nurse but is not working.
>
> On examination I did not find evidence of neurological disturbance.
>
> All in all, I think this woman is doing very well. She has a very small syrinx that is not changing. I would continue to monitor her with an MRI every year but otherwise don't see any reason to do anything else. I am not certain that all of her symptoms are due to the syrinx but find no other reason for the problems she is complaining about.

(*Id.* at 207).

In January 2000, Plaintiff underwent a vocational assessment by Caroline M. Wolfe, a Certified Rehabilitation Counselor for VoCare Services, Inc. Ms. Wolfe reached the following conclusions:

> [Plaintiff] is currently unable to function in even a [s]edentary strength range in which she would be expected to lift up to 10 pounds occasionally and in which she could sustain attention and position sitting at a computer or desk through a work day. She is slow to complete her activities of daily living at home, and she requires assistance from her family for homemaking duties. The pain and the medications she takes for pain impede her ability to focus and concentrate on activities, and they impair her memory.
>
> This level of function will prevent [Plaintiff] from performing work at even a [s]edentary level on a part-time basis. She has limitations to prevent the expansion of the syringomyelia and from the debilitating symptoms of pain and weakness which may be from the syringomyelia, degenerative disc disease, or a fibromyalgia-type syndrome or a combination of these diagnosed conditions.

(*Id.* at 214).

In November 2000, Dr. Melarango referred Plaintiff to Dr. Albert Berarducci, a neurologist, for an opinion regarding "care and management of [Plaintiff's] multiple neurological

7

conditions, including headache, back and leg pain." (Admin. Record at 650). Dr. Berarducci agreed with the diagnosis of "a syringomyelia cavity from T5 to L1 with particularly notable expansion cavity in the conus region of the spinal cord." (*Id.*). Dr. Berarducci also noted Dr. Brightman's conclusion not to shunt Plaintiff's lower spinal cord because "cervical spinal stenosis presented a second problem that would necessarily complicate interpretation of the pathophysiological effects of the syrinx caudally." (*Id.*). Plaintiff reported to Dr. Berarducci the experience of "pain, numbness and tingling in her legs" as well as weakness and fatigue. (*Id.*). Dr. Berarducci characterized Plaintiff's case as "very complex to summarize easily." (*Id.* at 651). He recommended Plaintiff to be monitored during physical conditioning, to enroll in a program for management of her chronic pain, and to undergo psychiatric consultation. (*Id.* at 652). According to Dr. Berarducci, "[i]f [Plaintiff's] depression is significantly improved, the scope of her symptoms may be diminished. I see no reason why [Plaintiff] cannot remain active as she wants to be, albeit with an altered style of getting things done. She has adequate strength on examination today to suggest that she should not be as disabled by this problem as she is. Perhaps this is the depression that complicates the problem in this way." (*Id.*).

Plaintiff saw Dr. Berarducci again in April 2001. At that time, Plaintiff continued to be "symptomatically stable, but she is not significantly improved on a functional level." (Admin. Record at 648). Dr. Berarducci stated that "[a]ll things considered, [Plaintiff] is rendered dysfunctional by the subjective components of her syndrome (headache, truncal and leg pain)." (*Id.*). Dr. Berarducci referred Plaintiff for an EMG study, which showed "no neuropathic cause for [Plaintiff's] pain syndrome." (*Id.* at 647). Dr. Berarducci continued to recommend Plaintiff for a "multidisciplinary pain control program including appropriate attention to physical

8

reconditioning . . . ." (*Id.*).

In November 2001, Dr. Berarducci stated that Plaintiff was making slow progress in her reconditioning but that it was advantageous for her to continue in the program. (*Id.* at 645). Dr. Berarducci also stated:

> I do not know how to interpret the constipation and urinary dribbling. There is a finite possibility the syringomyelia complicates voiding and defecation reflexes. However, all other studies of spinal cord function electrophysiologically are normal. I similarly do not know if there is a way to correlate the syringomyelia with the apparent Raynaud phenomenon in the lower extremities. It would seem tantalizing to do so. However, there is no other evidence of sympathetic dysautonomia. It may be necessary to have subspecialized evaluation of her autonomic nervous system but not at this point. There is no evidence of severe pathological Raynaud phenomenon on inspection today. Her subjective sensation of coldness in the feet may again be part and parcel of her tendency to somatosize.

(*Id.* at 645).

In April 2003, Plaintiff visited Dr. Berarducci after suffering an injury to her back while attempting to pick up laundry. (*Id.* at 643). Plaintiff complained of "sharp pains in the back immediately" which appeared to radiate to the hip. (*Id.*). Upon examination, Dr. Berarducci found Plaintiff's neurological state unchanged but found a "somewhat limited range of movement on lumbosacral spine testing . . . ." (*Id.*). Dr. Berarducci concluded that the pain was associated with "more of a musculoskeletal sprain of the lumbar region rather than a neuropathic back deterioration." (*Id.* at 643). According to Dr. Berarducci, Plaintiff was able to cope with the pain due to her work with stress management and relaxation exercises[6]. (*Id.*).

---

[6] Dr. Berarducci did note that "[a]ll things considered, [Plaintiff] has done an excellent job working through her initial disabilities to achieve a level of physical activity that she has become proud of." (Admin. Record at 643). These comments underscore the fact that, while the physical impairments continued unabated, the Plaintiff had struggled, somewhat successfully, to cope with her condition. Nothing in Dr. Berarducci's opinion indicated that Plaintiff could return to work.

In October 2003, following this Court's remand for consideration of Plaintiff's receipt of social security benefits, Defendant Nationwide upheld its decision to terminate Plaintiff's long-term disability benefits. The decision followed a medical review of records by Hayes Plus, an agency located in Pennsylvania[7]. Plaintiff was apparently not examined, but the reviewing physician stated:

> I have reviewed the volumes of records on Ms. Gerianne Morrison. I think that all of the records consistently show that this patient has a syringomyelia but none of the physical exams have demonstrated definite objective abnormality to go along with this abnormality. All of her complaints have been subjective and it is on this basis, I believe, that independent medical evaluation by Dr. Steiman concluded that there was no impairment or reason why she could not be doing her usual job. The records prior to 7-30-99 and after 7-30-99 are virtually identical in this regard therefore I believe that the records prior to 7-30-99 would have been sufficient for making a determination in her disability and anything after 7-30-99 would not have made a difference.
>
> Based on medical records reviewed there is no definitive objective impairment to support claimant's disability and I agree with the committee's decision to terminate benefits.

(*Id.* at 596).

With the foregoing facts in mind, the Court considers Plaintiff's claim for long-term disability benefits under ERISA.

## II.

Under 29 U.S.C. § 1132(a)(1)(B), a civil action may be brought by a participant or beneficiary of a disability benefits plan "to recover benefits due him [or her] under the terms of

---

[7]Defendant did not initially disclose the identity of the neurologist who performed the review for Hayes Plus, but ultimately in filings before this Court identified the physician as Dr. Gordon Kirshberg.

his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan." In reviewing a claim for alleged wrongful denial of benefits, the district court must base its decision solely upon the underlying administrative record. Evidence that was not presented to the plan administrator cannot be considered by the court. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). As a result, summary judgment procedures are inconsistent with the appropriate standard of review for recovery of benefits claims under ERISA. *Id.*

In considering the parties' motions, the Court first addresses the appropriate standard for reviewing Plaintiff's claim. The Supreme Court has held that "a denial of benefits challenged under section 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan vests such discretion in the administrator or fiduciary, the decision is reviewed under the deferential arbitrary and capricious standard. *See Perry v. United Food & Comm'l Workers District*, 64 F.3d 238 242 (6th Cir. 1995); *Perez v. Aetna Life Insurance Co.*, 150 F.3d 550, 555 (6th Cir. 1998). This standard "is the least demanding form of judicial review . . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Perry*, 64 F.3d at 242. Determinations are not arbitrary or capricious if they are "rational in light of the plan's provisions." *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991), quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988). Although a plan need not include "magic words" in order to vest the plan administrator with discretion, the grant of discretionary

11

authority must be "clear" in order to trigger the arbitrary and capricious standard of review. *Hoover v. Provident Life & Acc. Ins. Co.*, 290 F.3d 801, 807 (6th Cir. 2002); *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (*en banc*).

In contrast, the Sixth Circuit holds that "when applying a *de novo* standard in the ERISA context, the role of the Court reviewing a denial of benefits 'is to determine whether the administrator . . . made a correct decision.'" *Hoover* 290 F.3d at 808, quoting *Perry v. Simplicity Eng'g*, 900 F.2d at 963, 965 (6th Cir. 1990). Further, under the *de novo* standard of review, the decision of the administrator is not accorded a presumption of correctness or deference. *Perry*, 900 F.2d at 965.

### III.

The parties in this case dispute the standard of review to be applied by the Court. Before considering the issue, the Court sets forth certain terms of the Plan. "Disability" or "Disabled" are defined in the following way:

> (1) with respect to the Employee,
> (a) for Disabilities commencing prior to July 1, 1998, disability or disablement by which the Employee is wholly and continually disabled as a result of Injury or Sickness and is prevented from engaging for wage or profit in any occupation for which he or she is, or may become, qualified
>
> (b) for Disabilities commencing after June 20, 1998, disability or disablement by which the Employee is wholly and continuously disabled as a result of Injury or Sickness and is prevented from engaging in Substantial Gainful Employment for which he or she is, or may become, qualified . . . .

(Admin. Record at 692).

The Plan further states:

> "Substantial Gainful Employment" means any occupation or employment from which an individual may receive an income equal to or greater than such individual's Covered Compensation as of the date of his or her Disability.

(*Id.* at 706).

Section 13.1.6 of the Plan, entitled "Plan Administration" states, in part:

> The Plan Administrator shall have the power to take all actions required to carry out the provisions of the Plan and shall further have the following powers and duties, which shall be exercised in a manner consistent with the provisions of the Plan:
> (1) To exercise discretion and authority to construe and interpret the provisions of the Plan, to determine eligibility to participate in the Plan, and make and enforce rules and regulations under the Plan to the extent deemed advisable . . .
>
> (5) To determine the amount, manner, and time of payment of benefits hereunder . . .

(*Id.* at 779).

Plaintiff argues that the foregoing portions of § 13.1.6 do not vest the Defendant with discretionary authority sufficient to trigger the arbitrary and capricious standard of review under ERISA. The Court disagrees. Subsection (1) gives the Plan Administrator the discretion to "construe and interpret" Plan provisions. Such authority is sufficient to trigger the arbitrary and capricious standard of review. *See McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003). The Court therefore uses this standard in considering Plaintiff's claim.

## IV.

As stated above, if the administrative record supports a "reasoned explanation" for the decision as to benefits, then the decision is not arbitrary or capricious. *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). The Sixth Circuit has noted, however, that simply

because the arbitrary and capricious standard of review is deferential does not mean that the review is of no consequence.

> While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious . . . standard does not require us merely to rubber stamp the administrator's decision." *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir.2004) (citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir.2003)). Indeed, "[d]eferential review is not no review, and deference need not be abject." *McDonald*, 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *Id.*

*Moon v. Unum Provident Corporation*, 405 F.3d 373, 379 (6th Cir. 2005).

Thus, the issue for this Court is whether, viewing the administrative record as a whole, the Defendant has offered a reasoned explanation for its decision to deny Plaintiff long-term disability benefits. The Court concludes that Defendant has not.

Defendant's decision rests largely on the opinion of Dr. Steiman, a non-treating, examining physician. Dr. Steiman concluded that Plaintiff's conditions of syringomyelia and degenerative disc disease did not render her totally disabled from performing her former position of Business Technology Consultant. According to Dr. Steiman, Plaintiff's symptoms are manifested "primarily by subjective complaints with a paucity of objective physical findings upon examination." (Admin. Record at 464-65). Similarly, the neurologist who reviewed Plaintiff's medical record following the Court's remand acknowledged Plaintiff's diagnosis of syringomyelia but agreed with Dr. Steiman's finding that Plaintiff could return to her former job.

In contrast, Plaintiff's internist, Dr. Melarango, concluded that Plaintiff could not return to her former position. Drs. Steiman and Melarango are the only two physicians who opined on

the issue of Plaintiff's ability to return to her former position. It is clear that, the Court cannot credit Dr. Melarango's opinion over Dr. Steiman's simply because Dr. Melarango treated Plaintiff on numerous occasions over the years. In the context of evaluating claims for benefits under ERISA, there is no hard and fast "treating physician rule." Nevertheless, the Supreme Court holds that "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

After reviewing the record in this case, the Court finds Dr. Melarango's opinion to be based on reliable evidence which is supported by the opinions of other physicians who treated Plaintiff over many years. The Defendant arbitrarily refused to credit this evidence in favor of the opinions of Dr. Steiman and Dr. Kirshberg[8], the latter of whom reviewed only records and did not examine the Plaintiff.

The record contains undisputed evidence that Plaintiff suffers from degenerative disc disease and syringomyelia, which is a "slowly progressive syndrome of cavitation in the central segments of the spinal cord . . . ." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1841 (30th ed. 2003). In addition, it is apparent that Plaintiff experiences a variety of other debilitating symptoms, including headaches, depression, and pain in her legs, arms and back. Plaintiff's syringomyelia has remained unchanged over the years. The record reveals that Plaintiff has learned to cope with the various physical and emotional symptoms associated with her disease

---

[8]The Court finds Defendant's failure to disclose the identity of Dr. Kirshberg quite troubling. The Plaintiff argues that the Court should disregard the opinion in its entirety because of the Defendant's failure in this regard. The Court declines to do so, but cautions the Defendant to avoid such action in the future. In the Court's view, the opinion of Dr. Kirshberg arbitrarily ignores the objective medical evidence of record.

through physical therapy and pain management. In denying Plaintiff benefits, the Defendant focuses on the Plaintiff's progress in the areas of pain and stress management while ignoring the objective evidence of record that Plaintiff's disease of the spine has remained unchanged. Defendant's conclusion that Plaintiff is necessarily able to perform the duties of her former job simply because she can cope with pain is arbitrary and capricious. The entire record reveals that the Plaintiff is essentially coping with the severe limitations placed upon her activities by pain, which in turn is caused by objective, diagnosable medical conditions. In the Court's view, the overwhelming evidence in this case supports the opinion of Dr. Melarango that Plaintiff is unable to perform the duties of her former job. Both Drs. Brightman and Berarducci found that Plaintiff's physical symptoms and depression were persistent and limited her physically. Dr. Miner, a neurologist at Ohio State, found Plaintiff to be "doing very well" with regard to pain management (Admin. Record at 207) but also concluded that Plaintiff's syringomyelia had not changed over the years and that her various symptoms were likely attributable to the physical condition. Finally, the vocational rehabilitation counselor, Ms. Caroline M. Wolfe, concluded that Plaintiff is unable to perform even sedentary work on a part time basis due to her limitations from the syringomyelia and her symptoms of pain and weakness. (*Id.* at 214)[9]. By 2003, Dr. Berarducci noted that relaxation exercises had helped Plaintiff but her spinal condition and physical limitations had remained unchanged. (*Id.* at 645).

Contrary to Defendant's arguments, the fact that Plaintiff has shown some degree of improvement in her mechanisms for coping with pain, does not comport with a conclusion that

---

[9]As Defendant correctly points out, while Ms. Wolfe, who is not a physician, cannot opine as to whether Plaintiff is disabled, she can opine as to whether Plaintiff is limited in the ability to engage in substantial gainful employment.

16

Plaintiff is necessarily able to return to full-time employ in her former position. Such a conclusion arbitrarily disregards the majority of evidence in the record which shows that Plaintiff's syringomyelia and degenerative disc disease preclude her from performing substantial gainful employment, as the term is used in the Plan.

In sum, the Court concludes that the Defendant has failed to offer a reasoned explanation for its final decision to deny Plaintiff long-term disability benefits. The Court finds that Plaintiff is entitled to long-term disability benefits from the date of the onset of her disability.

### V.

For the foregoing reasons, the Plaintiff's Motion for Judgment as a Matter of Law on the Administrative Record (**Doc. #43**) is **GRANTED**. The Defendant's Motion for Judgment as a Matter of Law on the Administrative Record (**Doc. #44**) is **DENIED**.

The Clerk is **DIRECTED** to remove these motions from the Court's pending motions list and to enter Judgment in favor of the Plaintiff.

**IT IS SO ORDERED.**

9-13-2005
DATE

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE